L. G. TRAFTON *vs.* WALTER G. DAVIS et als.

Somerset.    Opinion March 29, 1913.

*Acceptance.   Breach of Contract.   Canning.   Corn.   Damages.   Delivery.*
*Degrees.   Effect of Frost on Corn.   Fact.   Frost.   High Land.*
*Low Land.   Time.   Unsuitable for Use.*

1. In this action to recover damages for breach of contract in refusing to accept a quantity of sweet corn grown by the plaintiff for the defendant, the burden was on the plaintiff to prove that his corn was suitable for canning purposes.

2. Upon the evidence in the case, the jury were not warranted in finding that the corn raised on the plaintiff's ten acre field was suitable for canning purposes.

3. With respect to the four-acre piece, which was on higher ground than the ten-acre lot, the evidence justifies the finding by the jury that the corn grown on that lot was suitable for canning purposes.

On motion by defendant. If plaintiff shall remit all of verdict above $251.28 within thirty days from the receipt of the certificate of this decision by the Clerk of Courts of Somerset County, motion for new trial, is overruled. If he does not so remit, the motion for a new trial is sustained and a new trial granted.

This is an action on the case to recover damages for breach of a contract, in refusing to accept a quantity of sweet corn planted by the plaintiff for the defendants, in accordance with a contract, in writing, between the parties for the season of 1911. The defendants based their refusal to accept said corn on the ground that it was unsuitable for canning purposes. The plea was the general issue and brief statement setting forth the written contract between the parties. The jury rendered a verdict for the plaintiff for $879, and the defendant filed a motion for a new trial.

The case is stated in the opinion.

*Merrill & Merrill,* for plaintiff.

*W. M. Bradley, and Forrest Goodwin,* for defendants.

SITTING: WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, KING, HALEY, JJ.

WHITEHOUSE, C. J. In this case, the plaintiff recovered a verdict of $879, as damages for an alleged breach of contract in refusing to accept a quantity of sweet corn grown by the plaintiff for the defendants, who were co-partners under the firm name of the Portland Packing Company. The case comes to the Law Court on a motion to set aside the verdict as against the evidence and because the damages are excessive.

The contract between the parties is in writing and of precisely the same tenor as the contract in the case of *Gardiner* v. *Davis* et als., supra. It was for the season of 1911, and by its terms the defendants agreed to accept and pay for all the corn grown by the plaintiff on fifteen acres of land, and "delivered at the defendants' cannery at Skowhegan in a green state, and in a suitable condition for canning, or at any time when ordered so to do." The plaintiff cultivated fifteen acres of corn, but made no claim on account of the corn grown on one acre that was "planted later than the rest, and didn't make a good stand." The corn in controversy here was raised on two fields, one of ten acres and one of four acres, situated on the elevation known as Bigelow Hill, about 2½ miles below the village of Skowhegan.

The defendants contend, in this case as in the Gardiner case, supra, that the severe frost of September 13 and 14, 1911, injured the plaintiff's corn to such a degree as to render it "unsuitable for canning purposes;" while the plaintiff contends that the injury to the corn was so slight that the corn was still suitable for canning at the time it was offered and rejected; and the only question for the consideration of the court is whether the defendants, by the terms of the contract, were under obligation to accept the corn, in the condition in which it is shown to have been at the time it was rejected, having reference to the capacity of the factory, the character and purpose of the entire enterprise and the manner in which the canning business was necessarily conducted in that factory to the knowledge of all the contracting parties.

The defendants' inspector did not examine the corn on the four-acre piece, after the frost, and they introduce no evidence in regard

to its condition,—relying solely upon the plaintiff's testimony as to the effect of the frost on that piece. The evidence relating to the severity of the frost, and the extent of the injury to the corn on the ten-acre lot, will be first considered.

It is not in controversy that on the night of the 13th of September, 1911, there was a frost throughout the State unequalled in severity, for that early date in the season, since the heavy frost of 1888. But it is contended in behalf of the plaintiff that, by reason of the fact that his corn was growing on a high elevation of land and the further fact that a portion of his ten-acre lot was exceptionally thick and heavy growth, affording better protection against the action of the frost, the probability of any serious injury to his corn was much less than it would be to ordinary crops growing on the lower grounds.

It is not in controversy that on Monday, September 18th, the defendants rejected the plaintiff's corn because they deemed it unsuitable for canning on account of the injury which it suffered from the frost. There is no evidence, or reason to believe, that they were actuated by any other motive in refusing to accept it. They were engaged in the canning business, and the Skowhegan factory was then in operation. They had large orders to fill, and had all the men and machinery required to turn out a product sufficient to fill them. They needed all the corn contracted for, that was suitable to can, to supply their customers; and their instructions to the foreman and field-inspector accordingly were to "get in all the corn that was not frost-bitten, but not to accept any more frost-bitten corn after Monday." It is obvious, therefore, that if any corn suitable for canning was rejected by the defendants, it was solely the result of an error of judgment on their part.

It is undoubtedly a fair inference from all the evidence that not so large a proportion of the plaintiff's corn was injured by the frost, and generally not so severely injured, as a majority of the crops on the lower lands. But it appears in evidence that it is impracticable to separate the good ears from the bad in the loads of corn that are brought in; and if only a comparatively small quantity of damaged corn is mingled with the good in the process of canning, some of the cans will be found unmerchantable.

With respect to the apparent effect of the frost upon the corn on the ten-acre lot, the testimony of the plaintiff is to the effect that the next day after the frost the field had the general appearance of having been struck by a light frost; that the flags or "top-most leaves" on a part of the stalks were frost-bitten and after the sun came out they turned a lighter color; that the rest of the leaves so bitten at the top eventually died; that the husks of the ears on a part of the hills were frosted on the ends and one or two inches down on the ears; that they continued to eat the corn on the table for two weeks after the frost and found "no indication of bitterness or anything of the kind;" and that he examined and tasted it before it was cooked and found it "full of milk and with no watery condition."

Mrs. Trafton, the plaintiff's wife, testifies that she had a telephone call from Mr. Hill, the defendants' field-inspector, the morning of the frost, inquiring if they had a heavy frost up there; and she told him she didn't think they did; and he told her to "tell Mr. Trafton to wait a few days, they wanted to get their corn from the low lands first." She further testifies as follows, "I heard the men talking it over at the breakfast table, and heard them say there had been a heavy frost, and spoke of the corn, the two Tracy boys . . . I heard them talking about it, and I could tell by the looks of things that there had been a frost of course, but the extent of it I didn't know anything about."

Irving Tracy, one of the "Tracy boys" who was working for the plaintiff and slept at the Trafton house, testifies that early in the morning there was "heavy frost;" he should say that it was "kind of a black frost;" that the frost was on the grass-ground and that the grass was slippery; that the ends of the flags on the corn were frosted a little, and at noon the flags that were chilled by the frost began to turn lighter color; and the next Friday it had commenced to turn lighter color "all over the tops of the field." The other "Tracy boy" testifies to the same effect in regard to the appearance of the corn after the first frost. He says he ate corn on the table there from that field, as he supposed, until Saturday night and found it good.

Three residents of Norridgewock also testify that a week after the frost they inspected and tasted some ears of corn in a small

basket brought over there by the plaintiff, and found them "sweet and good." The plaintiff had testified that he picked this corn from the field in question "just as it came," and he thought two or three of the ears showed frost.

As in the Gardiner case, *supra*, no evidence was introduced by the plaintiff in regard to the chemical changes that take place in the ear of corn resulting from the action of the frost on the husks of the ear, or the suitability of the corn for canning purposes at different points of time after it has been struck by the frost. The burden was upon him to prove that his corn was suitable for canning. But he offered no witness who had ever had any experience in canning corn, or engaged in any employment which imposed upon him the duty and responsibility of deciding whether, in a given case, frost-bitten corn was or not suitable for canning purposes.

The defendants introduced the same class of testimony that was heard in *Gardiner* v. *Davis* et als., *supra*; and they confidently claim to have proved by the testimony of packers of long experience and sound judgment in canning sweet corn, as well as by the evidence of expert chemists, that corn, frost-bitten as the pllaintiff's corn was according to his own testimony, is not suitable for canning purposes.

The defendants' field-inspector, Mr. Hill, testifies as to a conversation he had with the plaintiff on Monday after the frost, when the plaintiff endeavored to explain how much his corn was frost-bitten. He said "it was struck lightly, struck the leaves some . . . and he wanted to know when we wanted it hauled, and I told him we didn't want it before Wednesday anyway, and that before that time I would come down there and see his corn. . . . The next day I went over to Mr. Trafton's. We went through that piece. . . . It had the general appearance of corn that had been struck by the frost. . . . In some cases there were leaves that were merely killed at the end, others half-way, and others clear down to the stalk, and even traces, marks of frost, down on the stalks. . . . And in cases like that where the frost reaches down in that way, it strikes the ear also. I found the ears marked more or less." He further states that he had received orders from

Mr. Chute, the foreman of the Skowhegan factory, not to take any more frost-bitten corn after Monday; and after going over the plaintiff's field and inspecting the corn, he informed Mr. Trafton that under the orders he had received he "had got to reject his piece of corn."

The defendant Clinton L. Baxter testifies that he had experience in packing fields of corn that were slightly touched by the frost, so that the flags were frosted and some of the ears of the corn frosted one or two inches down on the husks, when he had kept the light-frosted corn separate from that which was more heavily frosted; and the result was the corn "ran very uneven." While all of it was not the same, some of it would be flat and tasteless, and had a very uneven appearance on opening the cans; one can would open very good and another can indifferent. If a dozen cans were opened, the corn would be found to run in different ways; and it caused them a great deal of trouble. He further testifies as follows, "after we shipped it to market, we had to take it back. The most marked complaints came the following summer around July; and some of it we didn't get back until nearly two years afterward. When it came back, some of it was sour and it was so inferior that we had to dump a great part of it, and we lost practically all of it . . . Some of it looks curdly, but not like the hard-frosted corn where practically all of it is the same, but this would be only a few cans mixed in which caused the trouble in each case. Some of it would be sloppy and taste flat,—it wouldn't be sweet." From his experience in packing corn from fields that were touched with frost so that the flags over a portion of the field are frost-bitten one or two inches down on the husks, and the tassels frost-bitten to such an extent that the general appearance of the field changes when the sun strikes it, he should say such corn was not suitable for canning, four or five days, or three or four days after the frost. He states that he had special experience with different fields of frost-bitten corn at North Anson in 1888, when there was a heavy frost, the severity of which was not equalled in succeeding years until 1911; that they kept the corn that came from the fields that were touched lightly by the frost separate and in different grades from the corn that came from the fields that were struck heavily by frost; and

that to his knowledge the lightly frosted corn from fields that had been kept separate came back to them in the condition described by him as unmerchantable corn.

Thomas W. Atwood, who had been in the employment of the defendants continuously for 23 years, testifies that the frost of 1911 was the most severe that they had ever experienced in his recollection; that he had examined, in the cans, corn from fields that had been struck by the frost, so that the ends of the flags and the tassels have been struck and some of the ears of corn frosted down one or two inches, and the general appearance of the field changed after the frost, and he should say that such corn is unsuitable and unsafe for canning purposes five or six days after the frost; some of the cans might show a change of consistency and some not; some of the cans would be found sweet and some flat and tasteless, and unsalable,—but they do not hear from it until it gets onto the market and into the hands of the consumer and back again, usually not for six months at least.

Mr. Chute, foreman of the factory, who had been engaged in the corn-packing business for more than twenty years, speaking of the severity of the frost says the water in the cans on the stoop of the factory was frozen on the morning of the 14th; that they closed operations at the factory that fall on the 20th, but took the corn from three fields after Monday, the 18th, including Mr. Palmer's; that on account of the favorable location and nature of the growth on one of Palmer's fields the corn brought to the factory from that field showed no indications of frost whatever; that Palmer had also planted a field of corn for the North Fairfield factory as well as for that at Skowhegan, and as he was unable to deliver all of the corn from the Skowhegan field in season for that factory to close on the 20th and had four or five loads picked for the Fairfield cannery. Chute arranged with Palmer to make an exchange and take the corn already picked for the Fairfield creamery, which was to run a week longer, in lieu of that in the Skowhegan field.

In relation to this transaction, Mr. Palmer called in rebuttal admits that when this exchange was effected for their mutual accomodation, he said nothing to Mr. Chute "about the North Fairfield corn being hit by the frost;" and as far as he knew, Chute was

swapping his good corn for the North Fairfield corn in order to close his factory the next day. He didn't consider it any of his business what they wanted it for,—he was willing to swap with them.

But whether the defendants' foreman was deceived or acted under a misapprehension or otherwise in exchanging good corn for that which was frost-bitten, is of very little importance. Even if he was induced to accept a few loads of corn no better than Trafton's, that fact has no necessary tendency to prove that the Trafton corn was suitable for canning. The defendant's evidence that it was unsuitable was further corroborated by the testimony of Mr. Webb of Portland, who has been engaged in the canning business for 32 years, by Mr. Grant of Unity, who has been engaged in canning corn for seven years in connection with his work as a farmer, by Mr. Eastman of Fryeburg, and Mr. Fernald of Poland, who have been engaged in the canning business for 25 years each; and also by the testimony of the chief chemist of the National Canners' Laboratory. None of these five witnesses last named have any connection whatever with the Portland Packing Company.

In order to give their brand of corn a legitimate status in the market, every can must be guaranteed under the Pure Food Act of Congress of 1906. Dealers who sell to their customers a high grade of goods, packed and inspected in accordance with approved methods, and expressly guaranteed under the Pure Food Act, with no defect discoverable by the exercise of the sense of sight, smell or taste, and hotel keepers and victualers who furnish such goods to their guests for food, are not liable for injuries to such customers or guests caused by eating such food, though it is in fact found to be poisonous. *Bigelow* v. *Maine Central R. R. Co.*, 109 Maine; 85 Atl., 396. Whatever liability for damages there may be in such a case, must rest solely upon the packer who cans the goods. In view of these rules of liability for injuries, and the beneficent legislation both Federal and State, designed to protect the people against the dangers of impure and unwholesome food, it is incumbent upon packers to exercise great vigilance and precaution in their endeavors to select for canning only such products as are entirely suitable for that purpose; and when they have manifestly acted in

good faith in rejecting any product offered under a contract which requires it to be suitable for packing, their conduct should be reviewed by the court with every consideration consistent with the rights of others.

In the case at bar, it is the conclusion of the court that the evidence did not warrant the jury in finding that the corn raised on the plaintiff's ten-acre field was suitable for packing, and that the verdict against the defendants for rejecting the corn from that field cannot be sustained.

But with respect to the four-acre piece, which was on still higher ground than the ten-acre lot, the evidence seems to justify a different result. As hereinbefore stated, the defendants introduced no evidence in relation to the effect of the frost upon the corn from that field, but relied solely upon the evidence introduced by the plaintiff, and the probabilities suggested by all the evidence in the case. The plaintiff testifies that he thought there were very slight indications of frost on that field, and upon examination he "saw that the frost hadn't injured it a particle;" and he so informed the defendants' inspector, Mr. Hill, but Hill said "it was no use to go near it," and he never did.

Irving Tracy, one of the plaintiff's workmen, who examined this field says he never saw a flag on that piece that was hit by the frost. Mr. Russell also testifies that he examined the corn in that field and found the flags, stalks and ears all green and in nice condition, and the kernels of corn sweet and juicy and in a milky condition. In the absence of anything to the contrary, aside from the presumption arising from the severity of the frost in that vicinity, the jury were warranted in finding the corn from this piece suitable for canning.

The jury appear to have assessed the damages at $62.82 per acre, or $251.28 for four acres. If, therefore, the plaintiff shall remit all of the verdict above $251.28 within thirty days from the receipt of the certificate of this decision by the Clerk of Courts of Somerset County, the motion for a new trial is overruled. If he does not so remit, the motion for a new trial is sustained and a new trial granted.